**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 1:21-cr-00569-TNM** |
| **JESSE R. BENTON** | |
| **Defendant.** | |

### UNITED STATES' OMNIBUS MOTION *IN LIMINE* TO ADMIT EVIDENCE

The United States of America, through undersigned counsel, hereby moves *in limine* for the admission of evidence at trial pursuant to the Federal Rules of Evidence.  By this motion, the government seeks to admit three categories of evidence: (1) events that occurred right before the inception of the conspiracy, which provide important information about the origin, nature, and purpose of the conspiracy; (2) Defendant Jesse R. Benton ("Defendant")'s conviction from immediately prior to the conduct charged in this case out of the Southern District of Iowa of campaign finance related criminal activity, which included one of the same statutes charged herein; and (3) evidence establishing that while committing the conduct charged herein, Defendant engaged in additional similar conduct, specifically attempting to cause an individual he believed to be a foreign national to make an illegal campaign contribution using a conduit contribution scheme.

The United States seeks to admit evidence that occurred prior to the inception of the conspiracy as intrinsic to the criminal conduct charged in this case.  The government further seeks to admit evidence regarding the conduct underlying Defendant's prior criminal convictions under Federal Rule of Evidence 404(b), as relevant to his knowledge, willfulness, intent, *modus operandi*, and lack of mistake or accident.  Finally, the government seeks leave to cross-examine Defendant and other witnesses regarding the other uncharged campaign finance related conduct

that occurred concurrent with the present offense, as well as to impeach Defendant with his prior convictions under Federal Rule of Evidence 609.

## I.  FACTUAL BACKGROUND

### A.  The Present Offense

On September 9, 2021, a federal grand jury sitting in the District of Columbia returned an indictment charging Defendant and Roy Douglas "Doug" Wead ("Wead")[1] with one count each of 18 U.S.C. § 371 (conspiracy); 18 U.S.C. § 1519 (causing false records); 52 U.S.C. § 30121 (electoral contributions by foreign nationals); and 52 U.S.C. § 30122 (electoral contributions in the name of another). As alleged in the Indictment, these charges arise out of a conspiracy involving Defendant, Wead and others to solicit a $100,000 political contribution from a Russian foreign national, Foreign National 1,[2] and to use those funds to make an unreported foreign national contribution to Political Committee C, a joint fundraising committee.[3]

As laid out in the Indictment, Foreign National 1 planned a trip to the United States in September 2016. In the course of planning that trip, Wead told Foreign National 1 that he could meet a celebrity. Indictment ¶ 25. Wead reached out to Foreign National 2, a Russian/English translator, on September 11, 2016, and suggested that Foreign National 1 could meet Political

---

[1]     Following the Indictment, Mr. Wead passed away. On December 23, 2021, the government filed a Motion to Abate Prosecution as to Mr. Wead only.  The Court granted that motion the same day.  As such, this case is proceeding as to Defendant only.

[2]     The government uses the same anonymizations for certain individuals and entities as in the Indictment.  The identities of those individuals and entities have been provided to Defendant in discovery.  The government will provide the Court with that information if requested.

[3]     Political Committee C was a joint fundraising committee comprised of Political Committee A (Political Candidate 1's principal campaign committee), Political Committee B (a national party committee), and other organizations supporting Political Candidate 1's political party in various states.  Indictment ¶¶ 14-16.

Candidate 1 during his trip to the United States. *Id.* ¶ 28. Wead reached out to Defendant telephonically the next day. *Id.* ¶ 29. From the very beginning of the conspiracy, Defendant sought to conceal its illegal object. Indeed, when Defendant reached out to individuals from Political Committee B to arrange for Foreign National 1 to make a political contribution and meet Political Candidate 1, he lied and claimed he had a friend who "spends most of his time in the Caribbean" who wanted to "fly in for an event" to attend a fundraiser and get a photograph. *Id.* ¶ 31. To hide the true purpose of the transfer of funds from Foreign National 1, Defendant created a fake invoice for "consulting services" for a non-profit organization, Company B, co-founded by Wead. *Id.* ¶ 40(e).

On September 19 and 20, 2016, Foreign National 1 wired Defendant's company, Company A, $100,000, in two separate transfers from an Austrian bank account. *Id.* ¶ 42. On September 21, 2016, after all of Foreign National 1's money was transferred, Defendant emailed Political Committee B and confirmed the purchase of two tickets to a Political Committee C fundraiser in Philadelphia, Pennsylvania. *Id.* Defendant continued to try to hide Foreign National 1's identity by, among other things, initially only providing Wead's name to Political Committee B. *Id.* ¶ 42. After the event, Defendant repeatedly lied to a consultant working for Political Committee C and Political Committee B, claiming that the required contribution had already been sent. *Id.* ¶ 48. On October 24, 2016, Defendant asserted for the first time that he had "bought the tickets and gifted them" to Wead and Foreign National 1 and that the money came from him. *Id.* ¶ 48(d). Two days later, on October 26, 2016, Defendant emailed the contribution information for the event, providing his own personal information and charging $25,000, half of the promised amount, to his personal credit card. *Id.* ¶ 49. Defendant paid the credit card with funds from Company A's bank account. *Id.* ¶ 51. Defendant kept $75,000 of Foreign National 1's money for himself. *Id.*

As a result of Defendant's false statements on the contributor form, Defendant caused Political Committee A, Political Committee B, and Political Committee C to file false reports with the FEC.  *Id.* ¶¶ 52-54.

**B.  Background to the Conspiracy**

Prior to the inception of the conspiracy in early 2016, upon Wead's invitation, Foreign National 1 began planning a trip to the United States to receive an award from Company B to meet a celebrity.  Through Foreign National 2, Wead arranged for Foreign National 1 to donate $100,000 to Company B in exchange for an award from the organization.[4]  On April 1, 2016, Foreign National 1 wired $100,000[5] to Company B for a "donation to the charity fund".  Wead gifted nearly $40,000 of Foreign National 1's funds to his daughters, and used the balance for personal and other business-related expenses.  None of the purported "donation" was spent for charitable purposes. Indeed, the evidence reflects that as of 2016, Company B was basically defunct.

Wead ultimately sent an invitation to Foreign National 2 for Foreign National 1 purportedly to attend a Company B committee meeting on September 26 and 27, 2016 in Washington, D.C., but struggled to find a celebrity for Foreign National 1 to meet at the awards dinner, as Wead had promised to induce Foreign National 1 to wire him funds.  Email communications from Foreign National 2 indicate that Foreign National 1 became increasingly concerned as time went on due to the lack of details surrounding the awards dinner and celebrity meeting.  Wead's challenges in finding a celebrity to meet Foreign National 1 led him to contact Defendant, resulting in the conspiracy charged in this case.

---

[4]      Wead agreed to pay Foreign National 2 a 10% commission in exchange for facilitating the donation.

[5]      Wead later wired $20,000 back to Foreign National 1.

### C.  Defendant's Previous Campaign Finance Conviction

The present case is not Defendant's first campaign finance offense.  On July 30, 2015, a federal grand jury in the Southern District of Iowa initially returned a sealed indictment charging Defendant and two associates with violating the Federal Election Campaign Act ("FECA") and various provisions of Title 18 of the United States Code.  *See United States v. Jesse Benton, et al.*, No. 15CR00103-JAJ, S. D. Iowa., Dkt. 2.[6]  On November 19, 2015, a federal grand jury in the Southern District of Iowa returned a superseding indictment charging Defendant and his two co-defendants with substantially the same criminal activity.  *Id.* at Dkt. 323.  Specifically, Defendant was charged with conspiracy, in violation of 18 U.S.C. § 371; causing false records, in violation of 18 U.S.C. §§ 1519 and 2; causing false campaign expenditure reports, in violation of 52 U.S.C. §§ 30104(a)(1), 30104(b)(5)(A), 30109(d)(1)(A)(i) and 18 U.S.C. § 2; and with a false statements scheme, in violation of 18 U.S.C. §§ 1001(a)(1) and 2.  *Id.*  On May 5, 2016, a jury found Defendant and both of his co-defendants guilty as to all charged counts.  *Id.* at Dkt. 554.

Defendant's previous conviction arose out of Defendant's work as the campaign chairman for Ron Paul's 2012 Presidential campaign.  *See United States v. Benton*, 890 F.3d 697, 704 (8th Cir. 2018).  Defendant and his co-defendants, who were also senior members of the Ron Paul campaign, sought the endorsement of an Iowa state senator during the Republican primary campaign.  *Id.*  A representative of the state senator, who was at the time employed by a rival campaign, offered to switch his allegiances for payment.  *Id.*  Defendant replied via email that the proposal "would be unethical and illegal" because it appeared to be trying to sell the senator's

---

[6]     Defendant went to trial on this initial indictment in October 2015.  That trial ended in a mistrial on several counts on October 22, 2015.  *See Benton, et. al.*, 15cr103-JAJ, Dkt. 296 (S.D. Iowa April 20, 2016).  The grand jury returned a superseding indictment thereafter.

endorsement.  *Id.*  Notwithstanding Defendant's written reaction to this proposal, Defendant and his co-defendants negotiated with the state senator and worked out a deal whereby the state senator would be paid for his endorsement.  *Id.* at 704-05.  The state senator ultimately decided to defect to Ron Paul.  *Id.*  Just before the endorsement became public, one of Defendant's co-defendants met with the state senator and gave him a $25,000 check, made out to a corporation owned by the state senator.  *Id.* at 705.  Just after the endorsement, the campaign prepared to wire another $25,000 to the state senator.  *Id.*

After the state senator switched his endorsement, members of the rival campaign began telling the press that the Paul campaign had paid the state senator for his endorsement.  *Id.*  In response to media inquiries, Defendant then lied – claiming that the state senator would not be paid by the Paul campaign and denying that the state senator would be paid a salary.  *Id.*  Defendant instructed others to similarly lie publicly.  *Id.*  Defendant also publicly claimed that financial reports would support his statement.  *Id.* at 706.  To ensure that they did, Defendant and his co-conspirators told the state senator not to cash the $25,000 check and Defendant and his co-conspirators agreed to erase the previously approved $25,000 "mystery wire."  *Id.*  Instead, the co-conspirators concocted a plan to hide the payments to the state senator by paying the state senator through a third party, a video production company owned by the brother of one of the co-conspirators.  To do so, the state senator sent an invoice to the video production company for "consulting services."  *Id.*  The video production company then sent the Ron Paul campaign a fake invoice for video services.  *Id.*  The scheme proceeded in this manner – with additional monthly payments to the state senator disguised as payments for audio visual expenses.  *Id.* at 706-07.  The campaign reported these expenses to the Federal Election Commission as audio/visual expenses, rather than their true purpose as payments to the state senator.  *Id.*

On September 20, 2016, Defendant was sentenced to two years of probation and six months of home confinement. *Benton, et. al.*, 15cr103-JAJ, Dkt. 648 (S.D. Iowa April 20, 2016). At trial and through sentencing and appeal, Defendant was represented by attorney Angela Campbell. One of Defendant's co-defendants, John Tate, was represented at trial and through appeal by attorney David Warrington.[7] Mr. Warrington continued to represent Tate through 2019, when the Supreme Court denied all three defendants *certiorari*. *Id.* at Dkt. 719-21.

On December 23, 2020, President Donald Trump granted a full and unconditional pardon to Defendant and Tate for this offense. The third co-defendant convicted at the same time on the same indictment, Dimitri Kesari, was not pardoned. The actual text of Defendant's pardon does not provide a rationale for that pardon. *See* Exhibit A. In announcing the pardon, the White House explained: "This action is supported by Senator Rand Paul and Lee Goodman, former Chairman of the Federal Election Commission. Both Mr. Tate and Mr. Benton were convicted based on indirect campaign payments to a state Senator. According to Mr. Goodman, the reporting law violated was unclear and not well established at the time." *See* Exhibit B.[8]

### D. Defendant's Additional Conduct

On October 24, 2016, the Telegraph newspaper broke a story in which an undercover reporter caught Defendant and another individual trying to accept a political contribution from a

---

[7]     Mr. Warrington represented Defendant on the present matter from approximately May 2021 through approximately February 2022. On March 2, 2022, Mr. Warrington withdrew as counsel after disclosing to the government for the first time that he was a potential trial witness.

[8]     It appears that the defendants may have raised a similar argument before the court in the Southern District of Iowa that was rejected. *See Benton, et. al.,* 15cr103-JAJ, Dkt. 513 (S.D. Iowa April 20, 2016). As the district court in the Southern District of Iowa recognized, the government's theory was not that the payment structure in that case by itself violated FECA, but rather that the expenses claimed on the FEC filing were false. *Id.*

Chinese donor in support of a Super PAC supporting a presidential candidate and using a scheme similar to the one charged in the instant offense. *See* Exhibit C; *see also* https://www.telegraph.co.uk/news/2016/10/24/exclusive-investigation-donald-trump-faces-foreign-donor-fundrai/. Specifically, according to the article, at a meeting at a New York city hotel on October 13, 2016, Defendant proposed to undercover reporters that the Chinese benefactor could contribute the money through Company A, which would then pass it along to two 501(c)(4) organizations before it was ultimately contributed to the Super PAC or used to fund projects the Super PAC had already planned. According to the article, Defendant suggested that the money paid to his firm (which was supposed to be $2 million) could be billed as a "large retainer" for consulting work, and Defendant sent a fake invoice to the reporters for the sake of "appearances." In searching Defendant's email pursuant to a search warrant, agents in this case discovered email correspondence between Defendant and the undercover reporter, including the fake invoice.

## II.   MEMORANDUM OF POINTS AND AUTHORITIES

### A. The Court Should Admit Evidence that Predates the Inception of the Charged Conspiracy as Intrinsic to the Conspiracy

As set forth above, shortly before the inception of the conspiracy at issue between Defendant and Wead, Wead convinced Foreign National 1, through Foreign National 2, to pay him $100,000 to receive an award from Company B and to meet a celebrity. Wead used the funds from the April 2016 transfer for his own benefit, and not for arranging the Company B dinner (or for any other charitable purpose). Wead's difficulty in finding a celebrity to meet Foreign National 1 led directly to the formation of the conspiracy between Defendant and Wead that gives rise to the charges at issue in this case. The evidence of the earlier dealings between Wead, Foreign National 1, and Foreign National 2, including the earlier transfer of funds, is admissible as it is intrinsic to the crime charged and is probative of the origin, nature, and purpose of the

conspiracy.

Evidence of the events prior to the illegal agreement between Defendant and Wead are admissible to show the formation of the conspiracy and particularly the circumstances which led Defendant to join the conspiracy. *See*, *e.g.*, *United States v. McGill*, 815 F.3d 846, 879 (D.C. Cir. 2016) ("In conspiracy prosecutions, the prosecution is usually allowed considerable leeway in offering evidence of other offenses to inform the jury of the background of the conspiracy charged . . . and to help explain to the jury how the illegal relationship between the participants in the crime developed.") (citations and internal quotations omitted); *United States v. Evans*¸ 216 F.3d 80, 86 (D.C. Cir. 2000) ("[A]s a general matter the prosecution is entitled to present the 'whole story' of criminal misconduct in order to guard against" the risk that "the jury [could] miss the context of the events and the moral significance of the allegations, and thus render an unjustified acquittal."). The fact that evidence "precedes the date of the inception of the conspiracy charged in the indictment" does not preclude its admission. *United States v. Diaz*, 878 F.2d 608, 616 (2d Cir. 1989). Further, "[e]vidence of behavior antedating the period covered by the indictment is generally admissible as bearing on the existence and purpose of the conspiracy and the significance of later behavior." *United States v. Bates*, 600 F.2d 505, 509 (5th Cir. 1979) (citations omitted); *see also United States v. Simmons*, 431 F. Supp. 2d 38, 58 (D.D.C. 2006) (evidence of acts preceding conspiracy is admissible to prove "the existence and purpose of the conspiracy and the significance of later behavior"; such evidence is admissible "as either direct evidence of the conspiracy, or evidence inextricably intertwined therewith, and [is] not subject to Rule 404(b) analysis").

Here, Wead's communications with Foreign National 1 through Foreign National 2, and acceptance of funds from Foreign National 1 – which Wead then used for his own benefit – directly

led to the formation of the conspiracy with Defendant.  Because Wead represented to Foreign National 1 that he would receive an award and meet a celebrity, but subsequently had difficulty delivering on his promises, Wead enlisted Defendant to facilitate a meeting between Foreign National 1 and Political Candidate 1 at a political fundraiser.  The evidence prior to the formation of the conspiracy at issue in this case provides important context and background for the formation of the conspiracy and illuminates the conspiracy's unlawful purpose.   To omit the earlier developments between Wead and Foreign National 1 from the evidence would unnaturally truncate the version of events presented to the jury and would deprive the jury of important information regarding the true nature of the criminal scheme.  Because this evidence is intertwined and intrinsic to the charged scheme, and is highly probative of the purpose of the charged conspiracy, it should be admitted.[9]

## B. The Court Should Admit Evidence of and Underlying Defendant's Prior Conviction Under Fed. R. Evid. 404(b)

### 1. Rule 404(b) Legal Standard

Federal Rule of Evidence 404(b) allows admission of evidence of other crimes, wrongs, or acts, as long as the evidence is not offered to prove character.  Rule 404(b) remains a "rule of inclusion" and permits the use of other-acts evidence to prove, among other things, motive, opportunity, intent, and knowledge.  *United States v. Bowie*, 232 F.3d 923, 929-30 (D.C. Cir. 2000).  Indeed, Rule 404(b) excludes only a narrow set of evidence – that which has no purpose other than proving a defendant's character.  *Bowie*, 232 F.3d at 930.  Thus, "[a] proper analysis

---

[9]     To the extent that the Court disagrees that the evidence that predates the existence of the conspiracy is intrinsic to the charged offense, the government submits that the evidence is admissible under Federal Rule of Evidence 404(b), as it is probative of Defendant's motive, opportunity, intent, and of lack of mistake or accident on the part of the co-conspirators.

under Rule 404(b) begins with the question of relevance: is the other crime or act relevant . . . to something other than the defendant's character or propensity?  If yes, the evidence is admissible unless excluded under other rules of evidence such as rule 403."  *Id.* at 930; *see also United States v. Washington*, 969 F.2d 1073, 1080-81 (D.C. Cir. 1992) (setting forth the test for admissibility under Fed. R. Evid. 404(b)).  In cases where conspiracy is charged, other-acts evidence is particularly relevant when it tends to prove the elements of conspiracy.  *See United States v. Mathis*, 216 F.3d 18, 26 (D.C. Cir. 2000).  "[O]ther crimes" evidence may also be properly introduced to impeach a witness.  *United States v. McGill*, 815 F.3d 846, 884 (D.C. Cir. 2016).

Evidence is relevant under Federal Rule of Evidence 402 if it has "any tendency to make the existence of any determinative fact more probable than it would be absent the evidence."  *United States v. Foster*, 986 F.2d 541, 545 (D.C. Cir. 1993).  In assessing relevancy, the Court looks to the connection between the item of evidence and "a matter properly provable in the case."  *United States v. Latney*, 108 F.3d 1446, 1449 (D.C. Cir. 1997) (quoting Fed. R. Evid. 401 advisory committee's notes).  "So long as the evidence makes a fact of consequence more or less likely, it is relevant."  *Id.*  Facts of consequence include elements of the charged offense, such as a defendant's intent and knowledge.  *See Bowie*, 232 F.2d at 930.

Evidence is reliable if it "is sufficient to support a jury finding that the defendant committed the other crime or act[.]"  *Id.*  The evidence must allow the factfinder to "reasonably conclude that the acts occurred and that the defendant was the actor."  *Huddleston v. United States*, 485 U.S. 681, 689 (1988).  Additionally, pursuant to Rule 403, "the probative value" of the other-acts evidence must not be "substantially outweighed by the danger of unfair prejudice."  *United States v. Douglas*, 482 F.3d 591, 600 (D.C. Cir. 2007).

**2.  Defendant's Prior Conviction and The Facts Underlying that Conviction Help Establish Knowledge, Willfulness, Intent, *Modus Operandi*, and Lack of Mistake or Accident**

Just months before Defendant engaged in the conduct charged in the present case, he was convicted after trial of campaign finance crimes.  These crimes included charges under 18 U.S.C. § 1519 – a statute that he is again alleged to have violated in the instant case.  Some of the crimes with which Defendant is charged in the present case require that the government prove that Defendant acted willfully.  "Willfully" in the FECA context requires that the United States prove "that the defendant acted with knowledge that his conduct was unlawful." *United States v. Singh*, 979 F.3d 697, 712 (9th Cir. 2020) (using the standard for willfulness set out in *Bryan v. United States*, 524 U.S. 184, 191-95 (1998)); *see also Benton*, 890 F.3d at 715 (finding no abuse of discretion where the district court used the *Bryan* standard for willfulness in FECA jury instructions).

The fact that Defendant committed similar conduct and was previously convicted of campaign finance related criminal activity, including one of the very same statutes charged here, is relevant to establishing that Defendant acted with knowledge that his conduct was unlawful. *See Bowie*, 232 F.3d at 930 (finding Rule 404(b) evidence properly admitted where intent and knowledge were facts of consequence to the case).  Indeed, the previous conviction and its underlying conduct, along with its proximity in time to the presently charged offense, are highly relevant not only to establishing Defendant's state of mind, but also to establishing that the present criminal activity was intentional and not a mistake or accident.  In other words, Defendant's prior conviction will demonstrate that he knew he had to conceal the solicited contribution from Foreign National 1 by acting as a straw donor and he intended to do so to conceal the illegal source of the funds.

This is precisely the sort of other-acts evidence for which admission at trial has been upheld in the past. For example, in the context of narcotics cases, the D.C. Circuit has a longstanding and consistent rule of allowing the admission of "other crimes" evidence relating to the possession of drugs under Rule 404(b) to show the defendant's knowledge and intent. *See, e.g.*, *United States v. McCarson*, 527 F.3d 170, 173-74 (D.C. Cir. 2008) (finding two prior possession with intent to distribute convictions and two firearm convictions were admissible under Rule 404(b) because they were probative of defendant's intent for the similar charges for which defendant was charged); *United States v. Pettiford*, 517 F.3d 584, 588 (D.C. Cir. 2008) (finding that district court properly admitted evidence of defendant's prior conviction as Rule 404(b) evidence as it showed in the instant case that defendant "knowingly and/or intentionally" committed the new charged offenses); *United States v. Burch*, 156 F.3d 1315, 1324 (D.C. Cir. 1998) (finding evidence of prior conviction went to defendant's knowledge and intent and was thus permissible under Rule 404(b)); *Washington*, 969 F.2d at 1080-81 (finding Rule 404(b) evidence of defendant's prior charges were offered to show more than defendant's character because they were probative of intent, knowledge, plan, and absence of mistake).

In addition, the facts of Defendant's previous case reflect many of the same hallmarks of the present case. In the previous case, Defendant and his co-conspirators sought to hide payments to an individual – in that case a state senator – through fake invoices that obscured the true purpose of the payments. In the present case, Defendant and Wead sought to hide the true purpose of Foreign National 1's transfer of funds to Defendant by creating a fake invoice for consulting services. The evidence from the prior case reflects that Defendant was aware that payments to the senator would be illegal, and that he needed to find a way to keep those payments from showing up on the campaign's FEC reporting. In the present case, Defendant similarly realized

the illegality of Foreign National 1's contribution, and hid the true source of the funds from Political Committees A, B, and C, so that the information they submitted to the FEC was similarly falsified.  As Defendant's previous conviction and its underlying facts are reliable and relevant to establish knowledge, willfulness, intent, *modus operandi*, and lack of mistake or accident, they are therefore admissible under Rule 404(b).

### 3.  The Probative Value of Defendant's Prior Conviction Is Not Substantially Outweighed by Unfair Prejudice

The evidence of Defendant's prior conviction is admissible because its probative value is not substantially outweighed by unfair prejudice.  *See United States v. Cassell*, 292 F.3d 788, 796 (D.C. Cir. 2002) (finding prior conviction was properly admitted where there was no "compelling or unique evidence of prejudice[.]").  "Rule 403 tilts, as do the rules as a whole, toward the admission of evidence in close cases, even when other crimes evidence is involved.  *Id.* at 795 (internal quotations omitted).  In performing the balancing test, "it is a sound rule that the balance should generally be struck in favor of admission when the evidence indicates a close relationship to the event charged."  *Id.*; *see also United States v. Thorne*, No. CR 18-389 (BAH), 2020 WL 122985, at *6 (D.D.C. Jan. 10, 2020) (unpublished) ("[B]y the express terms of Rule 403, 404(b) evidence is admissible, unless its probative value is substantially outweighed by a danger of . . . unfair prejudice, and thereby the identified danger must be amply weighty to warrant exclusion of otherwise probative relevant evidence.") (internal quotations and citations omitted).

The probative value of the evidence is high: it goes directly to an element that the United States must prove – intent, e.g., willfulness.  Moreover, Defendant's actions in his prior case, including the use of fake invoices, are very similar to what happened here.  Thus, the "similarity of the transactions and the small amount of time separating the events suggest that the prior act is highly probative."  *Washington*, 969 F.2d at 1081.  The balance of the Rule 403 factors therefore

weighs towards admission. *See id.* To the extent there is a concern that the jury may use the evidence for an improper purpose, this concern can be mitigated with a limiting instruction to the jury. *See e.g.*, *United States v. Straker*, 800 F.3d 570, 593 (D.C. Cir. 2015) ("Juries are presumed to follow instructions that caution them to draw only permissible inferences from Rule 404(b) evidence."); *United States v. Moore*, 651 F.3d 30, 96 (D.C. 2011) (finding that limiting instructions to a jury can cure any risk of prejudice). As such, this Court should admit evidence of Defendant's prior conviction.

### 4.   Defendant's Pardon Does Not Change This Analysis

The fact that Defendant's prior conviction was pardoned does not change the analysis. A Presidential pardon does not "blot out" a defendant's guilt for prior conduct; it merely mitigates punishment for the crime. *In re North*, 62 F.3d 1434, 1437 (D.C. Cir. 1994); *see also Nixon v. United States*, 506 U.S. 224, 232 (1993) ("[A] pardon is in no sense an overturning of a judgment of conviction by some other tribunal; it is [a]n executive action that mitigates or sets aside punishment for a crime.") (internal quotations omitted). Indeed, as the Supreme Court has recognized, a pardon "carries an imputation of guilt; acceptance a confession of it." *Burdick v. United States*, 236 U.S. 79, 94 (1915); *see also United States v. Wilson*, 32 U.S. 150, 150 (1833) ("A pardon is an act of grace, proceeding from the power intrusted with the execution of the laws, which exempts the individual on whom it is bestowed, from the punishment the law inflicts for a crime he has committed[.]") Thus, "a pardon cannot erase a judgment of conviction, or its underlying legal and factual findings." *United States v. Flynn*, 507 F. Supp. 3d 116, 136 (D.D.C. 2020) (citation omitted); *United States v. Crowell*, 374 F.3d 790, 794 (9th Cir. 2004) ("[O]ne who is pardoned is merely released from the disabilities attendant upon conviction and has his civil rights restored. . . . He is not entitled to erasure of the record of his conviction.") (internal citations

omitted).

Nothing about the pardon changes Defendant's conduct in his previous case, nor does it change his knowledge regarding the lawfulness of his actions. *See Flynn*, 507 F. Supp. 3d at 136. As noted above, the prior conviction and underlying facts are otherwise admissible under Rule 404(b). Thus, under Rule 404(b), the United States should be able to use evidence of Defendant's prior conviction, notwithstanding the pardon. *See generally Richards v. United States*, 192 F.2d 602, 605-08 (D.C. Cir. 1951) (discussing why a pardon does not create an exception to existing rules governing admissibility of evidence).

### C. The United States Should Be Allowed to Cross-Examine Defendant and Mr. Warrington Regarding Defendant's Other Uncharged Conduct

During the same timeframe that Defendant was committing the charged conduct, and after he was sentenced to home confinement, Defendant engaged in a substantially similar scheme that involved an undercover reporter for the Telegraph newspaper. Should Defendant take the stand at trial, the government should be allowed to cross-examine Defendant regarding this conduct. Specifically, the government should be able to cross-examine Defendant regarding statements he made to the Telegraph newspaper, many of which were video recorded. In these statements, Defendant described how he would take in the Chinese benefactor's funds to his company, Company A, and pass it through other organizations to the actual intended recipient of the funds (a Super PAC). In addition, the government should be able to cross-examine Defendant about a fake invoice that he created for the undercover reporter, as well as Defendant's representations on video that the reporters should not put any of what they were discussing "on paper."

The conduct described in the Telegraph article is probative under Rule 404(b) – at almost the exact same time Defendant was engaged in the charged conduct, he violated the terms of his home confinement to arrange for another conduit contribution by an individual he believed was

a foreign national to a Super PAC.  This separate scheme, like the one charged here, involved using Defendant's consulting company, Company A, to disguise the contribution as "consulting fees" and a fake invoice.  This evidence is therefore highly probative of Defendant's *modus operandi* in the charged case, as well as the lack of mistake or accident and his knowledge.  *See* Fed. R. Evid. 404(b); *Bowie*, 232 F.3d at 930.  Moreover, Defendant's express statements, on video, that the reporter should not put the plan "on paper" and Defendant's creation of yet another fake invoice, provide additional evidence of willfulness.  Should Defendant take the stand, his credibility will be directly at issue, and his conduct during the timeframe of the charged offense is highly probative and relevant.  The probative value of the conduct detailed in the Telegraph article is not substantially outweighed by unfair prejudice to Defendant, and the balance of the Rule 403 factors weigh towards admission.  *See Washington*, 969 F.2d at 1081 (finding no prejudice where evidence showed more than just the defendant's character and there was no "compelling or unique evidence of prejudice").

The government should similarly be allowed to question Mr. Warrington, should he testify, about his knowledge of Defendant's conduct as detailed in the Telegraph article.  In the materials provided thus far, counsel has represented that Defendant and Mr. Warrington had an active and ongoing attorney client relationship (apparently notwithstanding Mr. Warrington's concurrent representation of Defendant's co-defendant John Tate) and that Defendant sought legal advice relating to the charged offense.  Whether Defendant similarly sought advice regarding the conduct described in the Telegraph article, and what, if any facts, he provided Mr. Warrington regarding those similar activities, serve to potentially impeach Mr. Warrington's testimony, specifically as to whether Defendant was providing a full set of facts to his purported attorney before obtaining his legal advice.

### D. The United States Should Be Allowed to Impeach Defendant With his Prior Conviction

Should Defendant take the stand, the government should be allowed to impeach Defendant with his prior conviction under Federal Rule of Evidence 609.

#### 1. Rule 609 Legal Standard

Felony convictions utilized to attack the credibility of the defendant in a criminal case "must be admitted . . . if the probative value of the evidence outweighs its prejudicial effect to that defendant." Fed. R. Evid. 609(a)(1)(B). In addition, Rule 609 provides that any crime involving "dishonesty or false statement" must be admitted, regardless of the punishment. Fed. R. Evid. 609(a)(2) advisory committee notes; *see also United States v. Lipscomb*, 702 F.2d 1049, 1064 (D.C. Cir. 1983) ("Rule 609(a)(2) creates a *per se* rule that probativeness outweighs prejudice for crimes 'involv[ing] dishonesty or false statement.'"). The rule somewhat restricts the admissibility of felony convictions where the date of conviction or the release from confinement imposed for the conviction is more than ten years old, whichever is later. Fed. R. Evid. 609(b). Because of the very specific limits imposed by Rule 609, there is a broad standard of admissibility for convictions that do not run afoul of those limits. *See United States v. Lewis*, 626 F.2d 940, 950 (D.C. Cir. 1980) ("Courts should be reluctant to exclude otherwise admissible evidence that would permit an accused to appear before a jury as a person whose character entitles him to complete credence when his criminal record stands as direct testimony to the contrary."). Furthermore, "[w]here the Court has already concluded that the jury should hear about these prior convictions under Rule 404(b), it does not need to consider their prejudicial effect for Rule 609 impeachment purposes." *United States v. Ford*, 15-cr-25 (PLF), 2016 WL 259640, at *7 (D.D.C. Jan. 21, 2016) (citation and punctuation omitted); *accord United States v. Moore*, 75 F. Supp. 3d 444, 456 (D.D.C. 2014) (collecting federal circuit court cases declining to find prejudice based on the government's

additional use of a prior conviction for Rule 609 purposes where the trial court had already permitted the prior conviction for use in the government's case-in-chief under Rule 404(b)).

### 2. Defendant's Prior Conviction Is Properly Used for Impeachment

Defendant's prior convictions – felonies punishable by more than one year and within the prior ten years – meet Rule 609's initial threshold.  Moreover, Defendant's prior convictions for Conspiracy to Defraud the United States, in violation of 18 U.S.C. § 371, Causing False Records, in violation of 18 U.S.C. §§ 1519 and 2, Causing False Campaign Contribution Reports, in violation of 52 U.S.C. §§ 30104(a)(1), 30104(b)(5)(A) and 30109(d)(1)(A)(i), and 18 U.S.C. § 2, and False Statements in violation of 18 U.S.C. §§ 1001(a)(1) and 2, all involved a dishonest act and false statements, and thus, "*must* be admitted into evidence."  *See United States v. Holland*, 41 F. Supp. 3d 82, 92 n. 1 (D.D.C. 2014) (noting that the court would not be permitted to balance the probative value of the conviction against the prejudice to the defendant if the prior conviction required establish a dishonest act or false statement); *see also Lipscomb*, 702 F.2d at 1064 (recognizing that Rule 609(a)(2) created a *per se* rule that crimes involving dishonesty or false statement are admissible).  Indeed, in *United States v. Lipscomb*, the D.C. Circuit conducted an exhaustive review of the legislative history of Rule 609 and noted: "Congress believed that all felonies have some probative value on the issue of credibility."  702 F.2d at 1062.  The court went on to hold that "all felony convictions are probative of credibility to some degree."  *Id*.

### 3. Defendant's Presidential Pardon Does Not Change Its Admissibility Under Fed. R. Evid. 609

As discussed above, on December 23, 2020, President Trump granted a full and unconditional pardon to Defendant for his 2016 conviction.  It is important to note that Defendant's

pardon was not explicitly granted for purposes of rehabilitation or innocence.  *See* Exhibit A.[10] Under Federal Rule of Evidence 609(c), evidence of a conviction that has been pardoned is only inadmissible where the pardon was based on a finding that the person has been rehabilitated or the pardon was based on a finding of innocence.  The plain language of Defendant's pardon does not indicate that the pardon was based on either a finding of actual innocence or rehabilitation.  *See Zinman v. Black & Decker (U.S.), Inc.*, 983 F.2d 431, 435 (2d Cir. 1993) ("We have construed Rule 609(c)(1) strictly, interpreting it to bar admission of a prior conviction only when there has been an express finding that the person convicted has been rehabilitated."); *Watkins v. Thomas*, 623 F.2d 387, 387 (5th Cir. 1980) (allowing impeachment by pardoned convictions where defendant's pardons "were not the consequence of subsequent proof of innocence" but rather defendant was pardoned "because he performed undercover activities in the service of the Federal Bureau of Narcotics and Dangerous Drugs.").

The explanation for the pardon provided by the White House similarly does not indicate that the pardon was based on either a finding of actual innocence or rehabilitation.  *See* Exhibit B.

---

[10] The text of Defendant's pardon states, in relevant part:

> I, Donald J. Trump, President of the United States, pursuant to my powers under Article II, Section 2, Clause 1, of the Constitution, have granted unto Jesse R. Benton a full and unconditional pardon for his conviction in the United States District Court for the Southern District of Iowa on a superseding indictment (Docket No. 4:15-cr-00103-001) charging violations of Sections 371, 1001(a)(1), and 1519, Title 18, and Sections 30104(a)(1), 30104(b)(5)(A), and 30109(d)(1)(A)(i), Title 52, United States Code, for which he was sentenced on September 20, 2016, to two years' probation conditioned upon six months' home confinement and 160 hours' community service, a $10,000 fine, and a $400 special assessment.

*See* Exhibit A; *see also Executive Grant of Clemency for Jesse R. Benton*, Department of Justice, https://www.justice.gov/file/1349086/download (last visited July 29, 2021).

Indeed, the explanation for the pardon seems to ignore what was at issue in Defendant's previous case – the false statements that the campaign made to the FEC regarding the purpose of the payments – and instead focuses on the structure of the payments to the state senator, which all the parties recognized were not inherently illegal. *See U.S. v. Benton, et. al.*; 4:15-cr-00103-JAJ, Dkt. 513 (S.D. Iowa April 20, 2016) (recognizing that the government's theory was not that the payment structure by itself violated FECA, but rather that the expenses claimed on the FEC filing were false).

When a pardon is not based on a finding of actual innocence or rehabilitation, courts have allowed the government to use evidence of a prior conviction, as the government seeks to do here, for impeachment purposes. *See e.g.*, *United States v. DiNapoli*, 557 F.2d 962, 965 (2nd Cir. 1977) (finding no error in allowing the use of defendant's prior state misdemeanor conviction, notwithstanding a certificate of relief from the state for that conviction, because the certificate lacked an explicit finding of the defendant's innocence); *Watkins*, 623 F.2d at 388 (holding that it was permissible to use the defendant's past conviction for impeachment purposes, even though he received a pardon of such conviction because the defendant's actual innocence was not the basis for the pardon).

Moreover, as noted previously, while pardons mitigate the offender's punishment, "the granting of a pardon is in no sense an overturning of a judgment[.]" *Nixon,* 506 U.S. at 232.  Courts have made clear that a pardon "does not 'blot out guilt' in any literal or uncritical sense[.]" *Richards v. United States*, 192 F.2d 602, 607 (D.C. Cir. 1951) (citation omitted); *see also Bjerkan v. United States*, 529 F.2d 125, 128 n.2 (7th Cir. 1975).  As such, the effect of a presidential pardon in the D.C. Circuit is minimal.  For example, the D.C. Circuit previously rejected an appellant's contention that his full and unconditional Presidential pardon negated his prior indictment, such

that he was entitled to receive attorney's fees under the Ethics in Government Act. *North*, 62 F.3d at 1438. The court reasoned that because a Presidential pardon "does not blot out guilt or expunge the indictment[,]" the defendant's indictment precluded it from awarding the defendant the attorneys' fees he sought. *Id.* at 1438. Other courts have similarly taken a narrow approach on the impact of presidential pardons. *See Robson v. United States*, 526 F.2d 1145, 1147 (1st Cir. 1975) ("[T]he fact that petitioner has been pardoned does not relieve him from all the disabilities of a conviction."); *United States v. Noonan*, 906 F.2d 952, 960 (3d Cir. 1990) ("[The] Presidential pardon . . . does not eliminate [defendant's] conviction and does not 'create any factual fiction' that [defendant's] conviction had not occurred . . . ."); *United States v. Munoz-Gonzalez*, 812 F.3d 439, 442 (5th Cir. 2016) (explaining that "a pardon granted for reasons other than proof of innocence does not vitiate the defendant's prior crimes or convictions"); *Hirschberg v. Commodity Futures Trading Comm'n*, 414 F.3d 679, 682 (7th Cir. 2005) ("The effect of a pardon is not to prohibit *all consequences* of a pardoned conviction, but rather to preclude future *punishment* for the conviction."); *Robertson v. Shineski*, 26 Vet. App. 169, 179 (Vet. App. 2013) ("[A] Presidential pardon relieves the pardonee of the legal disabilities incident to a conviction of an offense . . . , but does not eliminate the consideration of the conduct [] that led to that conviction.").

Should Defendant take the stand, he has put his credibility directly at issue. Furthermore, Defendant's prior convictions involve dishonesty or false statements, and the Federal Rules of Evidence recognize that such prior convictions must be admitted for impeachment purposes. *See* Fed. R. Evid. 609.

### III.   CONCLUSION

The United States respectfully requests that the Court grant its motion *in limine* as discussed herein.

Respectfully submitted,

Corey R. Amundson
Chief
Public Integrity Section

By: */s/ Rebecca G. Ross*
Rebecca G. Ross
Michelle K. Parikh
Trial Attorneys
Public Integrity Section
Criminal Division
U.S. Department of Justice

Michelle L. Wasserman
Special Assistant United States Attorney
United States Attorney's Office for the
District of Columbia

## CERTIFICATE OF SERVICE

I hereby certify that this motion was filed by ECF on July 29, 2022, and thereby served on defense counsel.

*/s/ Rebecca G. Ross*
Rebecca G. Ross
Trial Attorney