**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **Criminal No. 1:21-CR-569-TNM** |
| | ) | |
| **JESSE R. BENTON,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## UNITED STATES' SENTENCING MEMORANDUM

While on probation for his previous campaign finance offense, the defendant, Jesse R. Benton ("Defendant"), worked with his co-defendant R. Douglas (Doug) Wead ("Wead"), to enable Roman Vasilenko, a Russian foreign national, to unlawfully contribute $25,000 into the 2016 campaign for President of the United States.  In so doing, Defendant caused Trump Victory, the Trump Campaign Committee, and the Republican National Committee ("RNC") to unwittingly falsely report to the Federal Election Commission ("FEC") that Benton, rather than Vasilenko, made the contribution.  There is no question that Defendant knew what he was doing, and that he knew what he was doing was wrong.  But more importantly, Defendant's prior conviction for campaign finance related criminal activity and his probationary sentence seemingly did <u>nothing</u> to deter his future criminal conduct.  Rather, Benton flouted the Court's orders issued in the Southern District of Iowa, violated the terms of his probation, and, in committing the instant offenses, once again undermined the transparency and integrity of the FEC reporting process and a federal election.  Defendant's conduct here was brazen, intentional, and unrepentant.  The Court should sentence Defendant to the high end of the guidelines - 24 months - which the United States submits is sufficient but not greater than necessary to meet the goals of sentencing, including specific and general deterrence.

I.    **FACTUAL BACKGROUND**

On September 9, 2021, a federal grand jury sitting in the District of Columbia returned an indictment charging Defendant and Wead[1] with one count each of 18 U.S.C. § 371 (conspiracy); 52 U.S.C. § 30121 (electoral contributions by foreign nationals); and 52 U.S.C. § 30122 (electoral contributions in the name of another); and three counts each of 18 U.S.C. § 1519 (causing false records).  The Defendant proceeded to trial, which began on November 9, 2022.  On November 17, 2023, the jury returned a verdict, finding Defendant guilty on all counts.

A.    **Defendant's Professional and Personal Background**

At the time of this offense, Defendant was an experienced political operative who had worked on numerous federal campaigns, including serving as campaign manager for Senator Mitch McConnell in 2014, and Senator Rand Paul in 2010, and as campaign chairman for Ron Paul's 2012 Presidential campaign.  During the 2016 campaign cycle, Defendant served as Chief Strategist for Great America PAC, one of the main Super PACs supporting the election of Donald Trump.

In July 2015, Defendant was indicted in the Southern District of Iowa for campaign finance related offenses arising out of conduct as campaign chairman for Ron Paul's 2012 campaign for President of the United States.  *See United States v. Jesse Benton et al.*, Case No. 15CR00103-JAJ, S. D. Iowa,[2] ECF No. 2.  On November 19, 2015, a federal grand jury in the Southern District of Iowa returned a superseding Indictment charging Defendant and his two co-defendants with substantially the same criminal activity.  *Id.* at ECF No. 323.  Specifically, Defendant was charged

---

[1]    Wead passed away from natural causes after indictment.

[2]    Defendant proceeded to trial on this initial Indictment in October 2015.  That trial ended in a mistrial on several counts on October 22, 2015.  *See United States v. Jesse Benton et al., Case No. 15CR00103-JAJ, S. D. Iowa.*, ECF No. 296.  The grand jury returned a superseding indictment thereafter.

with conspiracy, in violation of 18 U.S.C. § 371; causing false records, in violation of 18 U.S.C. §§ 1519 and 2; causing false campaign expenditure reports, in violation of 52 U.S.C. §§ 30104(a)(1), 30104(b)(5)(A), 30109(d)(1)(A)(i) and 18 U.S.C. § 2; and with false statements scheme, in violation of 18 U.S.C. §§ 1001 and 2. *Id.* On May 5, 2016, a jury found Defendant and both of his co-defendants guilty as to all charged counts. *Id.* at ECF No.554.

Defendant was sentenced for his prior campaign finance offense on September 20, 2016. On that date Defendant told the Court, "My family is paying such a huge price, and I would have never done anything on purpose if I would have known I would subject them to this kind of pain, both my wife and my daughter and our family in Texas. There's been years of sleepless nights, public humiliation time and time again. My career as the sole breadwinner is ruined.  I'll never really work again, at least not at the level that I once hoped to. The little bit of financial security that we once had is completely gone, facing seven figures in debt.  Our home is on the market and hopefully will be sold soon." *United States v. Jesse Benton et al.*, Case No. 15CR00103-JAJ, S. D. Iowa, ECF No. 690 at 16.  Defendant went on to ask the Court to impose a sentence of probation or home confinement, stating "[t]his seems to be a steep price to be paid." *Id.* at 17 ("If you can find mercy in your heart to punish me to probation or home confinement or perhaps even allow me to stay free pending appeal, I can hack out a humble living as a copywriter, keep my family afloat, and continue to raise my daughter to love the Lord and to love her country.").  The court in the Southern District of Iowa ultimately sentenced Defendant to 2 years of probation with a condition that he serve six months of home confinement. *United States v. Benton*, 15CR00103, ECF No. 648 at 4 (S.D. Iowa September 20, 2016).[3]

---

[3]       The United States asked the judge in the Southern District of Iowa to impose a sentence of 27 months custody.  In imposing its probationary sentence, the Court noted that the sentence was

Defendant did not, in fact, sell his house following his sentencing, and remained in that same home past the time the search warrants were executed in this case in May 2021. FEC records reflect that in 2016, Defendant's consulting business, Titan Strategies, took in at least $209,795.49 as a result of campaign related expenditures and independent expenditures. *See* Exhibit 1, FEC Data for Titan Strategies. FEC records reflect that in the 2017-2018 election cycle, Titan Strategies received $1,088,002.24 as a result of campaign related expenditures and independent expenditures. *See id*. Email and bank records gathered pursuant to the investigation confirmed that Defendant remained active in politics and political fundraising following his conviction in May 2016, including, receiving income from, and continuing to do work for, Great America PAC through the 2016 election cycle. *See, e.g.,* Exhibit 2, Invoice Sent By Benton to Beach for Great America PAC work.[4]

**B. The Instant Offense[5]**

On September 12, 2016, about a week before Defendant was sentenced on his previous campaign finance offense,[6] Doug Wead reached out to Defendant via telephone in an effort to find a political fundraiser that Roman Vasilenko could attend and get a photograph with Donald Trump.

---

appropriate due to his belief that Defendant's commission of the offense was "aberrant behavior for [Defendant]." ECF No. 690 at 22.

[4]    Bank records reflect that after Defendant nominally ceased working for Great America PAC in mid-2016, Great America PAC appears to have paid Defendant by wiring money to Frontline Strategies, Eric Beach's company, who wired money to a company called DGSB, who wired money to Defendant's company Titan Strategies.

[5]    The United States understands the Court is familiar with the facts of this case, and therefore does not repeat all of those facts here.

[6]    Even prior to his sentencing, Defendant was under conditions of release that required that he not commit any offense in violation of federal state or local law while on release. *United States v. Benton*, 15CR00103, ECF No. 65.

Shortly after the two men connected, Defendant began emailing contacts at the RNC to find such an event for Vasilenko.  From the beginning, Defendant was clear that his "friend" intended to make a contribution to attend the event, and even suggested that his "friend" might exceed the minimum giving level to get a photograph.  But Defendant also misled the RNC from the beginning regarding the identity of his "friend" and at no point revealed that Roman Vasilenko was a Russian foreign national, and therefore a prohibited source.  On September 14, 2016, Olga Kovalova, Wead's Russian/English translator, sent an email confirming that Roman was "happy and ready to wire his donation."  The next day Defendant emailed Wead the wire transfer information for the bank account belonging to his political consulting firm, Titan Strategies, which Wead passed along to Kovalova.  On September 19, 2016, Vasilenko wired Titan Strategies $49,000.  On September 20, 2016, the same day that Defendant was being sentenced in the Southern District of Iowa, Vasilenko wired Titan Strategies $51,000, for a total of $100,000.  As a cover story, the co-conspirators exchanged emails suggesting that the funds were for "consulting services."  Ultimately, Defendant sent an invoice for the funds, which purported to be for "Consulting Services Charity Awards Dinner."  As laid out at trial, Charity Awards was a basically defunct charitable organization run by Doug Wead.  There is no evidence Defendant ever did any consulting work for Charity Awards.

The day after Vasilenko transferred the full $100,000 to the Titan Strategies bank account, Defendant reengaged with his contacts at the RNC and confirmed the purchase of two tickets to a Trump Victory fundraiser that was to be held on September 22, 2016 at the Ritz Carlton, Philadelphia.  Defendant delayed providing Roman Vasilenko's name until the morning of the event, and even then, never provided any additional information about Vasilenko, including his nationality.  Vasilenko attended the event with Wead, which included participation in a roundtable

event during which Vasilenko sat seats away from the candidate, and a photograph with the candidate.  Two days later, on September 24, 2016, Wead hosted a gathering of approximately 14 people at the Maggiano's Little Italy in Tyson's Corner.  At that event, Wead gave Vasilenko an award.  The event at Maggiano's cost approximately $1200.  Defendant did not attend this event or the fundraiser, and never met with Vasilenko.  There is no evidence Defendant did any consulting work for Vasilenko or Charity Awards.

Defendant delayed making the required contribution for over a month after the event. During that month he repeatedly lied to a consultant working for Trump Victory regarding the pledged contribution.  On October 26, 2016, Defendant emailed a contributor form for the event to the Trump Victory consultant, listing himself rather than Vasilenko as the source of the contribution.  Defendant's credit card was charged $25,000 for the contribution the next day. Based on Defendant's false information on the contributor form, Trump Victory, the Trump Campaign, and the RNC all unwittingly falsely reported to the FEC that Defendant had made the contribution, rather than the true contributor Roman Vasilenko.

## C.  Defendant's Additional Conduct

On October 24, 2016, the Telegraph newspaper broke a story in which an undercover reporter caught Defendant and an individual named Eric Beach trying to accept a political contribution for Great America PAC, a pro-Trump super PAC, from a Chinese donor using a scheme similar to the one charged in the instant offense.  Specifically, according to the article, at a meeting at a New York City hotel on October 13, 2016, Defendant proposed to undercover reporters that the Chinese benefactor could contribute the money through Defendant's company, Titan Strategies, which would then pass it along to two 501(c)(4) organizations before it was ultimately contributed to the Super PAC or used to fund projects the Super PAC had already

planned.  According to the article, Benton suggested that the money paid to his firm (which was supposed to be $2 million) could be billed as a "large retainer" for consulting work, and Benton sent a fake invoice to the reporters for the sake of "appearances."  In searching Mr. Benton's email, agents discovered email correspondence between Benton and the undercover reporter, including the fake invoice.

At the time Defendant traveled to New York, he was on home confinement.  In traveling to New York to meet with the undercover reporter, Defendant lied to Probation and violated the terms of his home confinement.

## II.     DEFENDANT IS IN CRIMINAL HISTORY CATEGORY II

Defendant gets one criminal history point for his prior conviction, and two additional criminal history points because he committed the instant offense while under his sentence of probation, giving him three criminal history points.  Defendant is therefore in Criminal History Category II.

Despite the pardon, Defendant's prior conviction counts toward his criminal history score. In the application notes to USSG § 4A1.2, the Guidelines explain, "A number of jurisdictions have various procedures pursuant to which previous convictions may be set aside or the defendant may be pardoned for reasons unrelated to innocence or errors of law, e.g., in order to restore civil rights or to remove the stigma associated with a criminal conviction. Sentences resulting from such convictions are to be counted. However, expunged convictions are not counted."  USSG § 4A1.2, application note 10.  Defendant's pardon was not related to innocence or errors of law.  Indeed, this Court has already found that Defendant's pardon was not based on actual innocence, because the plain language of Defendant's actual pardon does not provide any rationale for the pardon.  Tr. Sept. 23, 2022 Mot. Hrg, at 54 ("The face of the Defendant's pardon says nothing about a finding of innocence or rehabilitation.  The pardon itself makes no mention of the rationale for the

pardon.") [7]  The pardon language itself similarly does not state that it was based upon "errors of law."  Under the Sentencing Guidelines, expunged convictions are not counted, but may be considered in determining whether a departure is warranted for inadequacy of criminal history category.  USSG §§ 4A1.2(j); 4A1.3.  Defendant's conviction was not expunged.  Because Defendant's conviction was not expunged and does not otherwise meet the required elements stated in the Guidelines, the conviction is counted.  *See* USSG § 4A1.2.

In announcing Defendant's pardon, the White House did provide an explanatory statement which stated: "This action is supported by Senator Rand Paul and Lee Goodman, former Chairman of the Federal Election Commission.  Both Mr. Tate and Mr. Benton were convicted based on indirect campaign payments to a state Senator.  According to Mr. Goodman, the reporting law violated was unclear and not well established at the time."  This Court has already found that the plain language of the actual pardon, rather than the explanatory statements, is what governs the analysis of the pardon.  Moreover, Defendant was not convicted based on indirect payments to a state Senator, but rather because he and his co-conspirators lied to the FEC regarding the purpose of the funds.  *See United States v. Benton*, 890 F.3d 697, 708 (8th Cir. 2018) ("Defendants were not charged with violating the Act merely by failing to report Sorenson as the ultimate recipient

---

[7]      The text of the Benton pardon states, in relevant part:

> I, Donald J. Trump, President of the United States, pursuant to my powers under Article II, Section 2, Clause 1, of the Constitution, have granted unto Jesse R. Benton a full and unconditional pardon for his conviction in the United States District Court for the Southern District of Iowa on a superseding indictment (Docket No. 4:15-cr-00103-001) charging violations of Sections 371, 1001(a)(1), and 1519, Title 18, and Sections 30104(a)(1), 30104(b)(5)(A), and 30109(d)(1)(A)(i), Title 52, United States Code, for which he was sentenced on September 20, 2016 to two years' probation conditioned upon six months' home confinement and 160 hours' community service, a $10,000 fine, and a $400 special assessment.

of the campaign's payments to ICT. Rather, the government was properly permitted to argue that [the] combination of a payee used to disguise the true payee, together with a false statement of purpose, was sufficient to violate the statutes alleged in the indictment.") (internal quotations omitted).   Moreover, the Eighth Circuit expressly considered whether the reporting law was unclear and rejected that argument. *Id.* at 710 ("We reject Defendants' arguments that the reporting requirements are so vague or confusing that we should either apply the rule of lenity or determine that criminal enforcement is not appropriate in this case. As set forth above, Defendants were not convicted for an unsuccessful, good-faith attempt to accurately report the disbursements to ICT, but for knowingly and willfully causing false reports to be filed with the Commission, a conviction that we conclude finds ample evidentiary support in the record.")

Mr. Goodman's opinion on Mr. Benton's conviction and the reporting law was therefore not based in fact, or law, nor does Mr. Goodman's opinion establish that there was any error in Defendant's prior conviction. *See United States v. Bays,* 589 F.3d 1035, 1039 (9th Cir. 2009) ("Application Note 10 appears to specify that a conviction is expunged only when relief is given because of innocence or errors of law. Such relief would eliminate any reference to the conviction on the defendant's record, not just negate the effects of the conviction. The pardon granted to Bays does not state that he is innocent or that there were errors in the criminal proceedings.").

Defendant's conviction therefore scores under the Guidelines and Defendant is in Criminal History Category II.

## III.   GUIDELINES CALCULATIONS

### a.   52 U.S.C. § 30121 and 30122 (Conduit/Foreign Contributions)

The Guidelines for the charges under 52 U.S.C. § 30121 and 30122 are the same and are as follows:

| | |
|---|---|
| Base offense Level [USSG § 2C1.8] | 8 |
| Specific Offense Characteristic (Value of funds greater than $15,000) [USSG § 2C1.8(b)(1); § 2B1.1(b)(1)(C)] | +4 |
| Specific Offense Characteristic (Money from foreign national) [USSG § 2C1.8(b)(2)(A)] | +2 |
| Adjusted Offense Level: | 14 |

### b.  18 U.S.C. § 1519 (Making False Entries in a Record)

| | |
|---|---|
| Base Offense Level [USSG § 2J1.2] | 14 |
| Adjusted Offense Level: | 14 |

### c.  18 U.S.C. §371 – Conspiracy

Because the conspiracy has multiple objects with different guidelines, each conspiracy is treated as if it were several counts, each charging a conspiracy to commit one of the substantive offenses.  USSG § 3D1.2, application note 8.  Then ordinary grouping rules apply to determine the combined offense level.  *Id.*  Because the three counts in the conspiracy group have the same offense level and group, the adjusted offense level for the Conspiracy count should be 14.

### d.  Grouping Analysis/Guideline Range

All of the counts group together under USSG §3D1.2(b) as they involve "the same victim" (i.e. the FEC/United States Government) and two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan," the offense level should therefore be 14.  USSG § 3D1.3(a).

Because Defendant is in Criminal History Category II, his Guidelines range is **18-24 months**.  His fine range is **$7,500-$75,000**.

## IV.   A SENTENCE AT THE HIGH END OF THE GUIDELINES RANGE IS APPROPRIATE IN THIS CASE

In calculating the appropriate sentence, courts begin with the applicable Sentencing Guidelines range.  *Gall v. United States*, 552 U.S. 38, 49 (2007).  The court then must consider the

factors articulated in 18 U.S.C. § 3553(a), which include, among other things, the nature and circumstances of the offense, the history and characteristics of the defendant, and the purposes of sentencing to reflect the seriousness of the offense, promote respect for the rule of law, provide just punishment, and afford adequate deterrence. *Id*. Courts have wide discretion in the weight they give each factor. Although the district court must "make an individualized assessment based on the facts presented, the procedural requirement that the district court 'consider' a particular § 3553(a) factor does not depend on how heavily the court weighs that factor." *United States v. Washington*, 670 F.3d 1321, 1328 (D.C. Cir. 2012) (internal quotation marks and citations omitted). Moreover, sentences within the Guidelines ranges are presumptively reasonable. *United States v. Law*, 528 F.3d 888, 902 (D.C. Cir. 2008). In the event a court decides to vary from the Guidelines range, the court "must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Gall*, 552 U.S. at 50 (noting that a "major departure should be supported by a more significant justification than a minor one."); *see also United States v. Khatallah*, 41 F.4th 608, 644 (D.C. Cir. 2022).

Consideration of the sentencing factors in Section 355 3(a) confirm that a Guidelines sentence is the sentence that is "sufficient, but not greater than necessary" here.

### A. The Nature and Circumstances of the Offense and the Need to Promote Respect for the Rule of Law

At the time of this offense, Defendant was not only a highly experienced political operative with deep knowledge of campaign finance; he also had experience with campaign finance related crime. Defendant knew that Roman Vasilenko could not legally make a political contribution because he was a Russian foreign national. Defendant knew that he could not legally serve as a conduit for Roman Vasilenko to make a political contribution. And Defendant certainly knew that causing a political committee to file a false report with the FEC was illegal, having been charged

and convicted of that same offense previously.   Defendant nonetheless took $100,000 from Vasilenko and ultimately used $25,000 of Vasilenko's money to make an unlawful political contribution.   In the process, Defendant lied to individuals at the RNC, Trump Victory, and his own attorney, all in an attempt to cover his tracks and hide his crimes.   Defendant's criminal activity in this case was brazen and his prior conviction and sentence clearly did <u>nothing</u> to deter his future criminal conduct.

But perhaps more importantly, Defendant's actions in this case undermined the transparency and integrity of the political process.   The rules and laws governing campaign finance are designed to ensure that our elections are free of foreign influence and that the public knows who is financing those elections.   Defendant's crimes cut at the heart of the Federal Election Campaign Act, and undermined its protective paradigm.   As Defendant's crimes make clear, it is all too easy for a political consultant or operative to use fake invoices to undercut and undermine the entire framework on which our campaign finance reporting regime is built.   The nature and circumstances of Defendant's offenses are serious.   Moreover, campaign finance crimes are difficult to unearth, investigate, and prosecute.   The need to promote respect for the rule of law is acute, both in general, and specifically for this Defendant.

### B.  The Defendant's Characteristics and History and the Need for Deterrence

Defendant comes before this Court unrepentant: he has never accepted responsibility for any of his criminal activity.   Indeed, despite telling the court in the Southern District of Iowa that he "would have never done anything on purpose" if he knew what he would put his family through, days later he knowingly and willfully engaged in the criminal conduct that formed the basis for his present conviction.   A month after that, he was caught exchanging emails with a Telegraph reporter, apparently trying to commit yet another campaign finance crime.   Far from deterring his

criminal activity, Defendant's prior conviction seems to have paved the way for even more criminal conduct.

Defendant's recidivism is perhaps not surprising: he has seen very little consequence from his criminal actions.  He got two years' probation on his prior conviction, had zero consequences for his probation violations, and received a Presidential pardon for that conviction.  In the 2017-2018 political cycle, which began just after his previous conviction, his political consulting business took in over $1,000,000.  Based on his experiences, Defendant may have thought that his (short-lived) slap on the wrist from his prior conviction was just the cost of doing business in the political arena.

A custodial sentence here is therefore not only warranted but required.  It is clear that specific deterrence is of paramount importance, to protect the public from further campaign finance related criminal activity by Defendant, and to hopefully get the message through to Defendant that he must change the way he does business.  Given Defendant's brazenness, general deterrence is also of great importance, to send the message to others who are similarly situated that campaign finance related crime is serious and will be punished accordingly.

Defendant's family circumstances do not mitigate against the 24-month sentence recommended by the United States.  "It is the sad reality that "prison sentences normally disrupt[] … parental relationships." *United States v. Miller*, 991 F. 2d 552, 553 (9th Cir. 1993).  Indeed, because of Defendant's wife's family, and their connections, it is apparent he could have easily been a successful political operative and consultant without resorting to crime.  Defendant's privileged history and characteristics make him more culpable, not less. *United States v. Stefonek*, 179 F.3d 1030, 1038 (7th Cir. 1999) ("[c]riminals who have the education and training that enables

13

people to make a decent living without resorting to crime are more rather than less culpable than their desperately poor and deprived brethren in crime.").

At the time Defendant committed his offense he made a clear choice: to continue relying on cheating and lying, and trying to skirt the rules and laws governing campaign finance, rather than trying to make a living following those rules. Defendant's actions must have consequences, and a 24-month sentence is sufficient but not greater than necessary to meet the goals of sentencing.

## V.  FINE

Under the Sentencing Guidelines "[t]he court shall impose a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine." USSG § 5E1.2.  Under the Guidelines, the fine range for Defendant's offense is $7,500-$75,000. *Id.*  Although Defendant claims a negative monthly cash flow, he does not appear to have submitted all of the required documentation to Probation. He also apparently sold his house in Kentucky and quit his job just before the trial in this case.  The United States therefore does not trust Defendant's representations regarding his financial situation and believes the Court can and should impose a fine.  The United States believes that a $75,000 fine is appropriate here: it is the high end of the Guidelines range and happens to be the exact amount of money that Defendant gained as a result of the criminal activity in this case.  The Court should therefore order Defendant to pay a $75,000 fine.

## VI.      CONCLUSION

For the foregoing reasons, the Court should sentence Defendant to 24 months custody, a

$75,000 fine, and three years of supervised release.

<div style="margin-left: 40%;">

Corey R. Amundson
Chief
Public Integrity Section

By: */s/ Michelle L. Wasserman*
Rebecca G. Ross
Michelle K. Parikh
Trial Attorneys
Public Integrity Section
Criminal Division
U.S. Department of Justice

Michelle L. Wasserman
Special Assistant United States Attorney
United States Attorney's Office for the
District of Columbia

</div>

Dated: February 10, 2023

**CERTIFICATE OF SERVICE**

I hereby certify that this memorandum was filed by ECF on February 10, 2023, and

thereby served on defense counsel.

/s/ *Michelle L. Wasserman*
Michelle L. Wasserman
Special Assistant United States Attorney